Slip Op. 17-85

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **UNITED STATES,** | |
| **Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **FARHAN KHAN,** | **Court No. 15-00250** |
| **Defendant.** | |

### OPINION AND ORDER

[Granting Plaintiff's motion for summary judgment, in part, and denying in part; and denying Defendant's cross motion for summary judgment.]

Dated: July 13, 2017

Guy R. Eddon, Trial Attorney, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, of New York, NY for plaintiff.  With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director.  Of counsel on the brief was Claire J. Lemme, U.S. Customs and Border Protection, Office of the Associate Chief Counsel, of Miami, FL.

Matthew Glen McKinney, Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A., of Orlando, FL for defendant.

Kelly, Judge:  This matter is before the court on Plaintiff the United States' motion for summary judgment under USCIT Rule 56 on its claims to recover unpaid duties, prejudgment interest, and civil penalties, as permitted by Section 592 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1592 (2012)[1] and Defendant Farhan Khan's cross motion

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of the U.S.

(footnote continued)

for summary judgment "finding that the merchandise at issue was classified by Defendant

in subheading 4202.92.1000, [Harmonized Tariff Schedule of the United States], through

the use of reasonable care, that the Defendant was not negligent in such classification,

and that no penalty should be assessed; and . . . dismissing this action in its entirety."[2]

See Pl.'s Mot. Summ. J., Aug. 25, 2016, ECF No. 14; Mem. Supp. Pl.'s Mot. Summ. J. 6–

14, Aug. 25, 2016, ECF No. 14; Def.'s Cross-Mot. Summ. J., Sept. 29, 2016, ECF No. 17.

Plaintiff claims that Defendant failed to exercise reasonable care to ensure that

statements made in connection with the importation of the merchandise were complete

and accurate by classifying entries of its products under Harmonized Tariff Schedule of

---

Code, 2012 edition.  Although the entries at issue were imported during the period beginning September 8, 2010 through May 10, 2012, see Pl.'s Statement of Material Facts As To Which There Are No Genuine Issues to be Tried ¶¶ 26, 35, Aug. 25, 2016, ECF No. 14; Def.'s Resp. Pl.'s Rule 56.3 Statement of Material Facts ¶¶ 26, 35, Sept. 29, 2016, ECF No. 21, neither party claims that any of the changes that took effect in the statute after the first entry date has any effect upon disposition of this action.  Therefore, the court applies the version of the statute in effect as of the date of the last entry, or May 8, 2012.

[2] The imported merchandise at issue includes three classes of products, including: (1) the container bags for wine bottles marketed under the "CoolSack" Brand ("CoolSack"); (2) can wraps ("CanCooler"); and (3) wine bottle wraps ("Wine Bottle Wrap").  See Pl.'s Statement of Material Facts as to which there are No Genuine Issues to be Tried ¶¶ 3–4, Aug. 25, 2016, ECF No. 14 ("Pl.'s R. 56.3 Statement"); Def.'s Resp. Pl.'s Rule 56.3 Statement of Material Facts ¶¶ 3–4, Sept. 29, 2016, ECF No. 21 ("Def.'s R. 56.3 Resp.").  Defendant imported all imported merchandise under subheading 4202.92.1000, HTSUS.

CBP determined that the classification of the entries of CoolSack imported merchandise entered by Defendant under subheading 4202.92.1000 should have been entered under subheading 4202.92.90, HTSUS, which covers ("Other [bags and cases]: With outer surface of sheeting of plastic or of textile materials: Other [than insulated food or beverage bags]: Other," carrying a rate of duty of 17.6 percent ad valorem.  See Pl.'s R. 56.3 Statement ¶¶ 33–40; Def.'s R. 56.3 Resp. ¶¶ 33–40; see also Pl.'s Mot. Summ. J. Exs. at Exs. 9–10, 14, Aug. 25, 2016, ECF Nos. 14-4, 14-6.  CBP changed the classification of the imported CanCooler and Wine Bottle Wrap merchandise to subheading 3824.90.92, HTSUS, which covers ("Other [chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included]: Other: Other: Other," carrying a rate of duty of 5 percent ad valorem.  See Pl.'s R. 56.3 Statement ¶ 41; Def.'s R. 56.3 Resp. ¶ 41.

the United States (2012) ("HTSUS") subheading 4202.92.1000.[3]  Mem. Support Pl.'s Mot.

Summ. J. 6–14, Aug. 25, 2016, ECF No. 14 ("Gov't's SJ Br."); see also Compl. ¶ 16, Sept.

3, 2015, ECF No. 2 ("Compl.").   For the reasons that follow, the court grants partial

summary judgment on Plaintiff's claims: (1) that Defendant negligently entered

merchandise into the commerce of the United States by means of materially false

statements; (2) for unpaid duties in the amount of $8,228.20; and (3) for prejudgment

interest.  However, the court denies summary judgment as to the appropriateness of the

penalty amount.  The court also denies Defendant's cross motion for summary judgment.

**UNCONTESTED FACTS**

The court first reviews the uncontested facts concerning the products at issue.

Thereafter, the court reviews procedural and jurisdictional facts related to the proceeding

that are not in dispute.

### A.  Facts Regarding the Imported Merchandise

The imported merchandise includes three types of freezable products: (1) the

beverage container bags ("CoolSack");[4] (2) the CanCooler for cans ("CanCooler"); and

(3) the Wine Bottle Wrap for wine bottles ("Wine Bottle Wrap").   Def. Artistic Creations

---

[3] The entries of imported merchandise were imported from the People's Republic of China between September 8, 2010 and May 10, 2012.  Pl.'s R. 56.3 Statement ¶ 35, Def.'s R. 56.3 Resp. ¶ 35.  All entries were classified by Defendant under subheading 4202.92.1000, HTSUS. See Pl.'s R. 56.3 Statement ¶¶ 26, 33, 35, Sept. 29, 2016, ECF No. 18; Def.'s R. 56.3 Resp. ¶¶ 26, 33, 35.  All references to the HTSUS refer to the 2012 edition corresponding to the version in effect at the time of the latest entry because no party alleges that there are any changes to the HTSUS subheadings at issue.

[4] These products include various styles of what invoices annexed to Defendant's entries describe as "PVC Cooler Bags," "2-Bottle Wine Bags," and "2-Colors Wine Bags".  See e.g., Exs. Provided Supp. Pl.'s Mot. Summ. J. Ex. 11 at CBP000253–CBP000256, Aug. 25, 2016, ECF No. 14-5.  No party alleges that the style of merchandise imported within each type affects the classification.

Rule 56.3 Statement of Material Facts ¶ 3, Sept. 29, 2016, ECF No. 18 ("Def.'s R. 56.3

Statement"); Pl.'s Resp. Def.'s Rule 56.3 Statement of Material Facts ¶ 3, Nov. 3, 2016,

ECF No. 22-1 ("Pl.'s R. 56.3 Resp."). All of the products are comprised of "a PVC outer

sheeting" and have cells filled with propylene glycol, purified water, and color powder.[5]

Def.'s R. 56.3 Statement ¶¶ 4–5; Pl.'s R.56.3 Resp. ¶¶4–5. The liquid within the cells of

all subject merchandise can be cooled when placed in the freezer. Def.'s R. 56.3

Statement ¶ 5; Pl.'s R. 56.3 Resp. ¶ 5. The "Wine Bottle Wraps" lack carrying handles

and do not have a bottom. Pl.'s Statement Material Facts As To Which There Are No

Genuine Issues to be Tried ¶¶ 10–11, Aug. 25, 2016 ("Pl.'s R. 56.3 Statement"); Def.'s

Resp. Pl.'s Rule 56.3 Statement of Material Facts ¶¶ 10–11, Sept. 29, 2016, ECF No. 21

("Def.'s R. 56.3 Resp."). The CanCoolers do not have carrying handles. Pl.'s R. 56.3

Statement ¶13; Def.'s R. 56.3 Resp. ¶13. The CanCooler has a bottom partially affixed

to the wrap. Pl.'s R. 56.3 Statement ¶ 9; Def.'s R. 56.3 Resp. ¶ 9. Neither the bottom of

the CoolSack nor the partially affixed bottom of the Can Cooler has any liquid filled cells.

Pl.'s R. 56.3 Statement ¶ 9; Def.'s R. 56.3 Resp. ¶ 9.

The tag attached to the CoolSack product states: "Simply Freeze Before Using!"

Pl.'s R. 56.3 Statement ¶ 16; Def.'s R. 56.3 Resp. ¶ 16. The instructions provided with

the CoolSack product, which were written or approved by Defendant, state:

---

[5] Plaintiff alleges that Defendant presented documentation to his broker representing that the liquid in the cells of the imported merchandise is comprised of "purified water, ethylene glycol and color powder." Pl.'s R. 56.3 Resp. ¶ 5 (citing Exs. Supp. Def.'s Cross-Mot. Summ J. Ex. J at PriorityOne-0001, Sept. 29, 2016, ECF No. 20-4). Defendant does not deny that Defendant presented this documentation to its customs broker, but he argues that it is irrelevant to this dispute "because none of the rulings relied upon by [CBP] even mention water and propylene glycol." Reply Supp. Def.'s Cross-Mot. Summ J. 1, Nov. 18, 2016, ECF No. 23.

> Artistic Creations CoolSacks are a stylish and innovative way to keep wine chilled.  Simply freeze the bag before using.  CoolSacks are great for hostess gifts or to take to your favorite BYOB.  It can also be used for water bottles, soft drinks, and anything else you want to keep chilled.
>
> Instructions:
> 1. Put the CoolSack in the freezer a few hours before use.
> 2. Do not keep in the freezer all the time.
> 3. Your CoolSack will need some time to re-soften before use.
> 4. Freezer temperature should not drop below 14 degrees Fahrenheit.

Pl.'s R. 56.3 Statement ¶ 17; Def.'s R. 56.3 Resp. ¶ 17.

## B. Jurisdictional and Procedural Facts

Defendant imported the merchandise at issue through a sole proprietorship, Artistic Creations, which is an importing business registered in the name of Defendant with the State of Florida.  Pl. R. 56.3 Statement ¶¶ 3, 26; Def.'s R. 56.3 Resp. ¶¶ 3, 26. From September 8, 2010, through March 16, 2012, Defendant imported the first eight out of a total of eleven entries through the port of Miami, Florida.  Pl.'s R. 56.3 Statement ¶ 26; Def.'s R. 56.3 Resp. ¶ 26.  Defendant, through his broker, classified the merchandise in each of these subject entries under subheading 4202.92.1000, HTSUS, which covers "[i]nsulated food or beverage bags: With outer surface of sheeting of plastic or of textile materials: Other" and carries a rate of duty of 3.4 percent ad valorem.  Pl.'s R. 56.3 Statement ¶¶ 27–28; Def.'s R. 56.3 Resp. ¶¶ 27–28.  Defendant imported an additional three entries of CoolSack merchandise: (1) on or about April 27, 2012 through the Port of Miami, Florida under entry number E10-0208645-5, Pl.'s R. 56.3 Statement ¶ 33, Def.'s R. 56.3 Resp. ¶ 33; (2) on or about May 8, 2012 through the Port of Miami, Florida under entry number E10-209187-7, Pl.'s R. 56.3 Statement ¶ 35, Def.'s R. 56.3 Resp. ¶ 35; and (3) on or about May 10, 2012 through the Port of Miami, Florida under entry number E10-

209188-5.  Pl.'s R. 56.3 Statement ¶ 35, Def.'s R. 56.3 Resp. ¶ 35.  These additional

entries were also classified by Defendant under subheading 4202.92.1000, HTSUS.  See

Pl.'s R. 56.3 Statement ¶¶ 33, 35; Def.'s R. 56.3 Resp. ¶¶ 33, 35.

Prior to any importation, Defendant consulted his customs broker, Priority One

Brokers, Inc. ("Priority One"), to inquire what rate of duty would be assessed on the

CoolSack merchandise.  Pl.'s R. 56.3 Statement ¶¶ 23–25; Def.'s R. 56.3 Resp. ¶¶ 23–

25; see also Exs. Supp. Def.'s Cross-Motion Summ. J. at Ex. J at Priority One 0001-0032,

Sept. 29, 2016, ECF No. 20-4 ("Broker Correspondence").  Priority One initially suggested

the CoolSack should be classified as an "insulated food or beverage bag of man-made

fibers" carrying a duty rate of 7% ad valorem before suggesting a classification under

4202.92.1000, HTSUS, which carries a duty rate of 3.4%.  See Def.'s R. 56.3 Resp. ¶ 24;

Pl.'s R. 56.3 Statement ¶ 24.  Plaintiff alleges, and Defendant offers no evidence to

contradict, that Priority One recommended three different proposed customs

classifications between 1:57 PM and 2:16 PM on February 16, 2010.  See Pl.'s Opp'n

Def.'s Cross-Mot. Summ. J. and Reply Supp. Mot. Summ J. 8–9, Nov. 3, 2016, ECF No.

22 ("Pl.'s Resp. Cross-Mot. and Reply Br."); see also Broker Correspondence at Priority

One 0014–0022 (containing time-stamped e-mails between Defendant and his customs

broker).  Defendant does not allege that he consulted with Priority One or took any other

steps to assess proper classification regarding the CanCooler or Wine Bottle Wrap

merchandise at any time.  Defendant does not allege that he sought a binding pre-

importation ruling from CBP for any of the subject merchandise, Pl.'s R. 56.3 Statement

¶ 20; Def.'s R. 56.3 Resp. ¶ 20, or consulted the publicly available CROSS database of

Customs Rulings prior to importation.  Pl.'s R. 56.3 Statement ¶ 21; Def.'s R. 56.3 Resp.

¶ 21.  Defendant admits that he did not know that CBP makes the CROSS database of

customs rulings available to the public online for free.  Pl.'s R. 56.3 Statement ¶ 22; Def.'s

R. 56.3 Resp. ¶ 22.

After Priority One's initial recommendations, Defendant did not renew his

discussion regarding the proper classification of the imported merchandise with Priority

One or any other customs professional until after CBP provided a Request for Information,

Form CF-28 regarding Entry No. E10-0205845-4 on August 17, 2011.  Def.'s R. 56.3

Resp. ¶ 25; Pl.'s R. 56.3 Statement ¶ 25; see also Pl.'s Opp'n Def.'s Cross-Mot. Summ.

J. and Reply Supp. Mot. Summ J. Ex. 32, Nov. 3, 2016, ECF No. 22-3.  Any renewed

discussion regarding the proper classification between Defendant and Priority One did

not occur until approximately a year after Defendant initially began importing the

merchandise.  Def.'s R. 56.3 Resp. ¶ 25; Pl.'s R. 56.3 Statement ¶ 25.

On April 16, 2012, CBP issued a Proposed Notice of Action to Defendant advising

that it had identified that the classification of entry E10-0207688-6, which includes

CoolSack cooler bags should be changed to subheading 4202.92.90, HTSUS, which

covers "Other [bags or cases]: With outer surface of sheeting of plastic or of textile

materials: Other [than insulated food or beverage bags]: Other," carrying a 17.6% ad

valorem duty rate.[6]  Pl.'s R. 56.3 Statement ¶¶ 30–31; Def.'s R. 56.3 Resp. ¶¶ 30–31.

On April 17, 2012, CBP issued a materially similar Proposed Notice of Action covering

five other entries.[7]  Pl.'s R. 56.3 Statement ¶ 32; Def.'s R. 56.3 Resp. ¶ 32.  Defendant

continued to make three additional entries of CoolSack merchandise after CBP issued

the April 16 and 17 Proposed Notices of Action.  See Pl.'s R. 56.3 Statement ¶¶ 33, 35;

Def.'s R. 56.3 Resp. ¶¶ 33, 35.  Defendant classified the entries under HTSUS

subheading 4202.92.1000.  See Pl.'s R. 56.3 Statement ¶¶ 33, 35; Def.'s R. 56.3 Resp.

¶¶ 33, 35.

On April 23, 2012, Priority One, wrote to CBP in Miami, Florida, referencing CBP's

Proposed Notices of Action, dated April 16 and 17, 2012, and referencing the entries E10-

0205845-4, E10-0206426-2, E10-0206679-6, E10-0207688-6, and E10-0208229-8.  See

Exs. Supp. Def.'s Cross-Motion Summ. J. at Ex. K at CBP000286, Sept. 29, 2016, ECF

---

[6] CBP's Proposed Notice of Action referenced "Binding Ruling N066398" and attached it.  See Pl.'s Mot. Summ. J. Ex. 17, Aug. 25, 2016, ECF No. 14-7.  The ruling concerned the tariff classification of a:

> non-woven polypropylene wine bottle bag coated on the outer surface with a sheeting of plastic.  It is designed to provide storage, protection, portability, and organization to its contents.  The bag has a compartment for a single bottle of wine, an open top, and double carrying handles.  The carrying bag is of durable construction and capable of repetitive use.  It measures approximately 5" (W) x 13" (L) x 3.5" (D).

NY N066398 (Jul. 24, 2009), available at 2009 WL 2423576.  In the ruling, CBP determined that the applicable subheading for the wine battle bag is subheading 4202.92.9060, HTSUS, which "provides . . . in part, for other bags and containers, with outer surface of sheeting of plastic, other, other, other.  The rate of duty will be 17.6 percent ad valorem."  Id.

[7] The April 17, 2012 Proposed Notice of Action, which is attached as an exhibit to Plaintiff's motion, also referenced and attached "Binding Ruling N066398."  Pl.'s Mot. Summ. J. Exs. at Ex. 18, Aug. 25, 2016, ECF No. 14-7.  CBP's Proposed Notice of Action, dated April 16, 2012, referenced the same customs ruling NY N066398 determining that the applicable subheading for the wine bottle bag is subheading 4202.92.9060, HTSUS.  Pl.'s Mot. Summ. J. Exs. at Ex. 17, Aug. 25, 2016, ECF No. 14-7.

No. 20-5 ("Priority One Letter").  The Priority One Letter references that Priority One is "in receipt of CBP Form 29 regarding the classification of the PVC Cooler Bags and disagree that the proper classification of the bags should be [subheading] 4202.92.9060[, HTSUS]." Id.  The Priority One Letter includes a printout of the CoolSack catalog, which Priority One argues demonstrates that "the essential character of the cool sack is its ability to maintain a cool temperature for the beverage." Id.  The Priority One Letter references CBP ruling HQ W968427, dated October 19, 2006.  See id. (citing HQ W968427 (Oct. 19, 2006), available at 2006 WL 4662649 ("Ruling HQ W968427")).  Further, the letter references the Harmonized Commodity Description and Coding System's Explanatory Notes ("EN") to subheading 4202.92, HTSUS, and argues that the CoolSack merchandise "are reusable and again, have the primary function to maintain the temperature of the beverage." Id. Finally, the Priority One Letter states that Priority One believes the original classification under subheading 4202.92.1000, HTSUS, is correct, and Priority One argues the Proposed Notices of Action should be canceled.  Id.

On May 5, 2012, June 9, 2012, June 13, 2012, August 25, 2012, and January 14, 2013, CBP issued materially similar Notices of Action determining that the classification of entries of various styles of CoolSack merchandise should be changed to subheading 4202.92.90, HTSUS, which carries a duty rate of 17.6%, and rate-advancing the entries. Pl.'s R. 56.3 Statement ¶¶ 34, 36, 37, 38, 39; Def.'s R. 56.3 Resp. ¶¶ 34, 36, 37, 38, 39. In the January 14, 2013 Notice of Action, CBP also determined that the classification of entries of CoolCan and Wine Bottle Wrap merchandise should be changed to subheading 3824.90.92, HTSUS, which covers "Other [chemical products and preparations of the

chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included]: Other: Other: Other" and carries a duty rate of 5 percent ad valorem.  Pl.'s R. 56.3 Statement ¶¶ 40–41; Def.'s R. 56.3 Resp. ¶¶ 40–41.

On February 21, 2014, CBP issued a pre-penalty notice.  See Exs. Provided Supp. Pl.'s Mot. Summ. J. at Ex. 27, Aug. 25, 2016, ECF No. 14-9 ("Pre-Penalty Notice").  In the pre-penalty notice, dated February 21, 2014, CBP fixed the classification of the CoolCan and Wine Bottle Wrap merchandise under subheading 3824.90.92, HTSUS.  Pl.'s R. 56.3 Statement ¶ 40; Def.'s R. 56.3 Resp. ¶ 40.  The pre-penalty notice issued by CBP identified a total revenue loss of $90,748.42, proposing a culpability level of negligence, and proposing a penalty of $181,496.84, i.e., two times the total revenue loss.  Pl.'s R. 56.3 Statement ¶ 43; Def.'s R. 56.3 Resp. ¶ 43; see also Pre-Penalty Notice.  On November 18, 2014, CBP issued a penalty notice reducing the proposed penalty to $45,374.21 and demanding payment of unpaid duties of $8,228.20 representing the difference between the amount deposited at entry and the duties assessed at liquidation for the subject entries.  Pl.'s R. 56.3 Statement ¶ 45; Def.'s R. 56.3 Resp. ¶ 45; see also Exs. Provided Supp. Pl.'s Mot. Summ. J. at Ex. 28, Aug. 25, 2016, ECF No. 14-9 ("Penalty Notice").  A copy of the penalty notice states that Defendant's "failure to properly file the correct classification and rate of duty applicable to the imported merchandise . . . resulted in underpaid duties in the amount of $90,748.42 (potential loss of revenue of $79,724.11

+ actual loss of revenue of $11,024.31)[.]"[8]  Id.  Further, the Penalty Notice states that the surety paid the full potential loss of revenue of $79,724.11 and a partial payment of $2,796.11 towards the actual revenue loss.  Id.  According to the penalty notice, only actual loss of revenue remains outstanding as of November 18, 2014, and the letter states that remaining actual loss of revenue is $8,228.20 as of the same date.  See id. Defendant does not contest CBP's accounting of the payments made or outstanding revenue losses as of the November 18, 2014 penalty notice.  Nor does Defendant allege that any additional payments were made by Defendant or anyone on his behalf thereafter.

On March 12, 2014, Defendant wrote a letter to CBP responding to the February 21, 2014 pre-penalty notice.[9]  Pl.'s R. 56.3 Statement ¶ 44; Def.'s R. 56.3 Resp. ¶ 44. Defendant has not paid the $8,228.20 in duties or the $45,374.21 in penalties demanded by CBP.[10]  Pl.'s R. 56.3 Statement ¶ 46; Def.'s R. 56.3 Resp. ¶ 46.

---

[8] CBP's regulations define "actual loss of duties" for purposes of 19 U.S.C. § 1592 as "duties of which the Government has been deprived by reason of the violation in respect of entries on which liquidation had become final."  19 C.F.R. § 162.71(a)(1) (2012).  CBP's regulations define "potential loss of duties" as "the duties of which the Government tentatively was deprived by reason of the violation in respect to entries on which liquidation had not become final."  19 C.F.R. § 162.71(a)(2) (2012).

[9] A copy of the letter is submitted as an exhibit in support of Plaintiff's motion for summary judgment.  See Exs. Provided Supp. Pl.'s Mot. Summ. J. at Ex. 7, Aug. 25, 2016, ECF No. 14-3. In the letter, Defendant states that he provided information regarding the imported merchandise to his customs broker, and Defendant argues that, "[i]f the Custom[s] Broker classified the item wrong, they are the ones that should pay the fees or get their license revoked."  Id.  Defendant further argues that he reasonably relied upon the advice of his customs broker and characterized his conduct as innocent.  See id.  Lastly, Defendant asks CBP to excuse any unpaid duties and penalties and satisfy any unpaid sums from the customs broker because Defendant relied on its advice, and Defendant stresses the financial pressure the duty and penalty demands were placing upon his small company.  See id.

[10] Specifically, Defendant responds that he has "(over)paid all duties that are owed, and denies that any penalty is proper."  Def.'s R. 56.3 Resp. ¶ 46.  From this response, it is reasonable to infer that Defendant admits he has not paid the duties demanded in the penalty notice referenced in Plaintiff's Rule 56.3 statement.  See id. at ¶ 45.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1582(1) and (3) (2012), which grant the court exclusive jurisdiction of any civil action commenced by the United States arising out of an import transaction to recover a civil penalty under 19 U.S.C. § 1592; 28 U.S.C. § 1582(1) (2012); 19 U.S.C. § 1592; or  customs duties, 28 U.S.C. § 1582(3) (2012).  The Court reviews all issues in actions brought for the recovery of a monetary penalty under § 1592 de novo, including the amount of any penalty.   19 U.S.C. § 1592(e)(1).  Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).  "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration."  JVC Co. of Am., Div. of US JVC Corp. v. United States, 234 F.3d 1348, 1351 (Fed. Cir. 2000).  In order to raise a genuine issue of material fact, it is insufficient for a party to rest upon mere allegations or denials, but rather the party must point to sufficient supporting evidence for the claimed factual dispute to require resolution of differing versions of the truth at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986); Processed Plastics Co. v. United States, 473 F.3d 1164, 1170 (Fed. Cir. 2006).

## DISCUSSION

### I.  Plaintiff is Entitled to Partial Summary Judgment on its Penalty Claim

Plaintiff argues it is entitled to summary judgment on its claim for penalties on Defendant's negligent violations of 19 U.S.C. § 1592(a) because it cannot be disputed

that Defendant made repeated material false statements by classifying the imported

merchandise under subheading 4202.92.1000, HTSUS, as: (1) none of the subject

merchandise is insulated, see Gov't's SJ Br. 8; and (2) the CoolCan and Wine Bottle Wrap

merchandise are not bags, see id. at 7.  The court first defines the relevant tariff terms

within subheading 4202.92.1000, HTSUS, to determine whether Defendant's

classification constitutes a false statement.  Next, the court addresses the materiality of

any false statements.  The court then addresses any issues of fact as to whether

Defendant exercised reasonable care in entering the merchandise in violation of the

statute.  Lastly, the court discusses the appropriateness of the penalty demanded by

CBP.

### A.  Subheading 4202.92.1000, HTSUS

The dispute centers on whether any of the imported merchandise is classifiable

under subheading 4202.92.1000, HTSUS, which covers:

4202    Trunks, suitcases, vanity cases, attache cases, briefcases, school
satchels, spectacle cases, binocular cases, camera cases, musical
instrument cases, gun cases, holsters and similar containers;
traveling bags, insulated food or beverage bags, toiletry bags,
knapsacks and backpacks, handbags, shopping bags, wallets,
purses, map cases, cigarette cases, tobacco pouches, tool bags,
sports bags, bottle cases, jewelry boxes, powder cases, cutlery
cases and similar containers, of leather or of composition leather, of
sheeting of plastics, of textile materials, of vulcanized fiber or of
paperboard, or wholly or mainly covered with such materials or with
paper;

        4202.92    With outer surface of sheeting of plastic or of textile
materials:

                ---Insulated food or beverage bags:

                    ---With outer surface of textile materials:

4202.92.1000        Other.

Subheading 4202.92.1000, HTSUS.  Plaintiff argues that the common and commercial meaning of the term "insulated food or beverage bags" under this tariff subheading, refers to an article with low or impeded thermal conductivity.[11]  See Pl.'s Suppl. Br. Supp. Mot. Summ. J. 6, May 1, 2017, ECF No. 29 ("Pl.'s Suppl. Br.").  Further, Plaintiff claims that "insulated" items are only those that can maintain the temperature of foods or beverages that are hot or cold.  Id. at 7.  Defendant counters that the term "insulated" in 4202.92.1000, HTSUS, refers to an item composed of any material "that enhances the bags['] ability to maintain the temperature of foods and beverages over an ordinary bag."  Suppl. Mem. Law Supp. Def.'s Cross-Mot. Summ. J. 4, May 1, 2017, ECF No. 30 ("Def.'s Suppl. Br.").

"[N]o person, by fraud, gross negligence, or negligence . . . may enter . . . any merchandise into the commerce of the United States by means of . . . any document or electronically transmitted data or information, written or oral statement, or act which is material and false[.]"  19 U.S.C. § 1592(a).  The importer of record is required to, using reasonable care, file with CBP the classification and rate of duty applicable to the merchandise, and information necessary to enable CBP to properly assess duties on the merchandise.   19 U.S.C.  § 1484(a)(1)(B).   Importers must identify "the appropriate subheading under the provisions of the [HTSUS] . . . and the rate of duty for the

---

[11] Plaintiff distinguishes between products that prevent the passage of heat between two objects, which Plaintiff argues are insulated, and those that absorb heat after being chilled, which Plaintiff argues are not insulated.  Pl.'s Suppl. Br. Supp. Mot. Summ. J. 5, May 1, 2017, ECF No. 29.

merchandise being entered." 19 C.F.R. § 141.90(b) (2012).[12] Therefore, the classification

of the entry under an incorrect subheading of the HTSUS constitutes a material false

statement. See 19 U.S.C. § 1484(a)(1)(B); 19 C.F.R. § 141.90(b).

The court determines the proper meaning of the tariff provisions for classification

purposes, which is a question of law. See Link Snacks, Inc. v. United States, 742 F.3d

962, 965 (Fed. Cir 2014) (citations omitted). Customs classification is governed by the

General Rules of Interpretation ("GRI"), which are part of the HTSUS statute. BenQ Am.

Corp. v. United States, 646 F.3d 1371, 1376 (Fed. Cir. 2011). To determine whether

merchandise can correctly be classified within the relevant subheading, the court first

construes the language of the heading in question "and any relative section or chapter

notes." GRI 1. The "terms of the HTSUS are construed according to their common

commercial meanings." BenQ Am., 646 F.3d at 1376.

In construing the terms of the headings, "[a] court may rely upon its own

understanding of the terms used and may consult lexicographic and scientific authorities,

dictionaries, and other reliable information sources." Carl Zeiss, Inc. v. United States,

195 F.3d 1375, 1379 (Fed. Cir. 1999) (citation omitted). The court may also consult the

ENs, which may indicate the proper interpretation of HTSUS provisions and are

persuasive so long as they do not contradict the commercial meaning of an ambiguous

term. See StoreWALL, LLC v. United States, 644 F.3d 1358, 1362–63 (Fed. Cir. 2011)

---

[12] Further citations to Title 19 of the Code of Federal Regulations are to the 2012 edition. As already discussed with regard to the applicable version of the statute, neither party claims that any of the changes to the applicable provisions of Title 19 of the Code of Federal Regulations that took effect after the first entry date has any effect upon disposition of this action. Therefore, the court references the version in effect as of the date of the last entry, or May 8, 2012.

(citations omitted).  In determining the common and commercial meaning of an eo nomine tariff term, the court should also consider if the tariff term nonetheless implicates the use of the article.[13]  See <u>GRK Canada, Ltd. v. United States</u>, 761 F.3d 1354, 1358–59 (Fed. Cir. 2014).

Both parties concede that a bag is a container made of some flexible material, such as paper, plastic, or leather that is used for carrying or storing items.  See Pl.'s Suppl. Br. 7 (quoting <u>Webster's Third New International Dictionary</u> 162 (Philip Babcock Gove, Ph. D. and Merriam-Webster Editorial Staff eds. 1993)); Def.'s Suppl. Br. 4 (quoting <u>The American Heritage Dictionary of the English Language</u> 134 (Fifth Ed. 2011)).  Neither party offers any dictionary definition for the compound terms "food bag" or "beverage bag."  The court is unable to locate any lexicographic source that defines the meaning of the term "bag" as modified by the terms "food or beverage."  The Explanatory Note to the Harmonized Commodity Description Coding System ("EN") clarifies that the expression "insulated food or beverage bags" in heading 4202, HTSUS, "covers reusable insulated bags used to maintain the temperature of foods and beverages during transport or temporary storage."[14]  See Explanatory Note to Heading 4202, HTSUS.  Further, the ENs state that the subheading "covers the articles specifically named therein and similar containers."  See Explanatory Note to Heading 4202, HTSUS.

---

[13] An eo nomine provision is one "that describes an article by a specific name, not by use." <u>Aromont USA Inc. v. United States</u>, 671 F.3d 1310, 1312 (Fed. Cir. 2012).

[14] All citations to the ENs are to the 2012 version, the most recently promulgated edition at the time of importation of the last imported entries.  There were no applicable changes to the relevant EN between the date of importation of the first entry and the last entry.

The lexicographic sources emphasize the ability of an insulated article to retard or prevent the passage of heat by means of a non-conducting material.  See Webster's Third New International Dictionary 1173 (Philip Babcock Gove, Ph. D. and Merriam-Webster Editorial Staff eds. 1993); The American Heritage Dictionary of the English Language 909 (Fourth Ed. 2000).  The lexicographic sources do not specify the extent to which an insulated article that retards the passage of heat must slow the transmission of heat from one body to another.  However, the ENs clarify that "insulated food or beverage bags" must maintain the temperature of foods or beverages during transport or temporary storage.  See Explanatory Note to Heading 4202, HTSUS.  The period of time required by the terms "temporary storage" or "transport" are not explained by the ENs.  For a food or beverage, the court's understanding of the terms "temporary storage" or transport" when applied to "insulated food or beverage bags" would mean slowing or preventing the passage of heat from the food or beverage or to the food or beverage in question to maintain it at as close to ideal temperature as possible from the time the beverage is removed from a heating or cooling source until consumption.

Defendant argues that the tariff term "insulated" refers to any characteristic that "enhances the bags['] ability to maintain the temperature of foods and beverages over an ordinary bag."  Def.'s Suppl. Br. 4.  Defendant's definition of the term would essentially consider any food or beverage bag insulated so long as it is capable of maintaining the temperature of those items for any amount of time.  However, the fact that the tariff term applies the term "insulated" to a "food or beverage bag" makes clear that the insulation must be adapted to the application of maintaining the temperature of either a hot or cold

food or beverage for a reasonable time before an ordinary person would consume the food or beverage in question. Therefore, any enhancement, however negligible will not be sufficient to render an item an "insulated food or beverage bag" under subheading 4202.92.1000, HTSUS.

Defendant also implies that the potential for an item to keep a food or beverage chilled is sufficient for an item to be an "insulated food or beverage bag" within the meaning of the tariff term. See Def.'s Suppl. Br. 4. However, Defendant offers no evidence that the common and commercial meaning of the tariff term applies to items that are capable exclusively of maintaining the temperature or of chilling a beverage that is already cold. In the absence of evidence contradicting the common and commercial meaning of the term provided by lexicographic sources and the ENs, the court declines to adopt the meaning of "insulated food and beverage bags" advanced by Defendant. The court need not set the outside parameters of how long a food or beverage bag may be able to maintain the temperature of a food or beverage in this case because Defendant offers no evidence to support his assertion that the imported merchandise can maintain the temperature of a hot beverage. An "insulated food or beverage bag," as used in subheading 4202.92.1000, HTSUS, must be able to retard the passage of heat to or from a hot, as well as a cold, food or beverage.

The court must consider whether use is implicated by the tariff terms at issue, even when the term under consideration appears to be an eo nomine tariff term. GRK, 761 F.3d at 1358–59. An eo nomine tariff term may implicate use in one of two ways: 1) a tariff term written as an eo nomine provision may nonetheless be controlled by use and,

if it is, the court should declare it as such,[15] id. at 1359 n.2; see also StoreWALL, 644 F.3d at 1365–67 (Dyk, J., Concurring); or 2) a tariff term may imply that the use of the object is of "paramount importance" to its identity such that articles with the requisite physical characteristics will nonetheless be excluded if they are in fact designed and intended for another use.[16]  GRK, 761 F.3d at 1358 (citing United States v. Quon Quon Co., 46 C.C.P.A. 70, 73 (1959)).

Here, although an insulated food or beverage bag may indeed be designed to insulate a food or beverage, nothing about the term suggests that an insulated food or beverage must be principally or actually used to insulate food or beverages in order to be classified in the subheading.  The word "use" or similar words do not appear in the tariff term.  Although the ENs do mention that insulated food or beverage bags are used to maintain the temperature of such items, the capacity of an insulated food or beverage bag to maintain temperature is a function of physical characteristics that impart insulative

---

[15] In GRK, the Court of Appeals for the Federal Circuit stated that, in cases controlled by use, "[c]lassification of subject articles may then need to reach the Additional Rules of Interpretation, which distinguish the treatment of articles based on whether tariff classifications are controlled by principal or actual use." GRK, 761 F.3d at 1359 n.2.  A tariff provision is controlled by use when the definition of the tariff term turns on its use, such that the language in the tariff term (or the Section or Chapter Notes) indicates that the use of the covered articles is more important than any physical characteristics. Primal Lite, Inc. v. United States, 182 F.3d 1362, 1363–64 (Fed. Cir. 1999) (finding strands of electric lights with certain decorative plastic covers not classifiable in subheading for "lighting sets of a kind used for Christmas trees," because use in connection with Christmas trees must be the predominant or principal use of goods classifiable within that subheading, and commercially fungible goods were predominantly used for decorating not associated with the Christmas holidays or Christmas trees).

[16] If the court determines that the intended use is of "paramount importance," the use should be considered along with the physical characteristics as part of the definition of the tariff term. GRK, 761 F.3d at 1358–61; United States v. Quon Quon Co., 46 C.C.P.A. 70, 73–74 (1959); see also StoreWALL, 644 F.3d at 1365–67 (Dyk, J., concurring) (discussing Processed Plastic Co. v. United States, 473 F.3d 1164, 1169–70 (Fed. Cir. 2006)).

qualities and not how the bag is principally or actually used.[17]  Therefore the provision for

"insulated food or beverage bags" is an eo nomine provision, not a subheading controlled

by use.

Furthermore, the subheading for "insulated food or beverage bags" is not one

where use is of paramount importance here because use is only of paramount importance

when, as a factual matter, a product that satisfies the physical requirements of a tariff

term is in fact designed and intended for another use.  See, e.g. Quon Quon, 46 C.C.P.A.

at 73–74 (finding that woven rattan imports were not baskets because they were designed

for use as patio furniture).  All products have uses.  Indeed, the physical characteristics

of a product will normally reflect the fact that a product has been designed for a use.  The

issue of whether use is of paramount importance only arises if the court determines that

the product may be classified in a particular heading based on its physical characteristics

but potentially excluded because it has a use that is inconsistent with the use referenced

in the provision.  See Quon Quon, 46 C.C.P.A. at 73–74.  To the extent that Defendant

suggests that subheading 4202.92.1000, HTSUS, may be a provision where use is of

_____

[17] Defendant argues that 4202.92.1000, HTSUS, is a principal use provision because the ENs
emphasize the use of insulated bags to maintain the temperature of foods or beverages during
transportation or storage.  Def.'s Resp. and XMSJ Br. 6–8.  Defendant emphasizes that, if the
principal use of the imported merchandise is considered, then Defendant's merchandise is
properly classified under subheading 4202.92.1000, HTSUS.  See id. at 6–7.  However,
Defendant misunderstands what constitutes a principal use provision.  A tariff provision is
controlled by use (principle use or actual use) when the definition of the tariff term turns on its
use, such that the language in the tariff term (or the Section or Chapter Notes) indicates that the
use of the covered articles is more important than any physical characteristics.  Primal Lite, Inc.
v. United States, 182 F.3d 1362, 1363–64 (Fed. Cir. 1999).  Nothing in subheading 4202.92.1000
indicates that principal use of an insulated food or beverage bag in the marketplace is more
important than the article's capacity to maintain temperature.  Rather, whether the item is an
insulated food or beverage bag is a function of physical characteristics that impart the item's
insulative qualities.  See Subheading 4202.92.1000, HTSUS.

paramount importance, <u>see</u> Def.'s Suppl. Br. 3–4, Defendant misunderstands what it means to be a provision where use is of paramount importance.  Defendant is not arguing that its imported merchandise should be excluded from subheading 4202.92.1000 based on its use.  <u>See</u> Def.'s Resp. and XMSJ Br. 6–8; Def.'s Suppl. Br. 3–4.

Based on the foregoing, subheading 4202.92.1000, HTSUS, covers containers which at a minimum are made of a flexible material capable of: (1) transporting or temporarily storing foods or beverages; and (2) slowing or preventing the passage of heat from a hot or cold food or beverage to maintain its temperature.

### B.  Defendant Made Material and False Statements Regarding the Entries

Plaintiff argues that Defendant made material false statements by classifying the imported merchandise as insulated food or beverage bags within subheading 4202.92.1000, HTSUS.  <u>See</u> Gov't's SJ Br. 8.  Defendant claims that he cannot have made material false statements regarding the entries if he classified them properly.  <u>See</u> Def.'s Resp. and XMSJ Br. 15.  Although the statute does not define materiality, CBP's regulations define materiality for purposes of § 1592 as a false statement that has an effect on CBP's determination of the applicable duty.  19 C.F.R. Pt. 171, App'x B (B).  For the reasons that follow, Defendant made material and false statements by classifying the imported merchandise within subheading 4202.92.1000, HTSUS, which carries a lower customs duty than the classification of the imported merchandise ultimately determined by CBP.  The imported merchandise are not "insulated food or beverage bags" within the meaning of the term.

USCIT Rule 56(c) requires that, in order to demonstrate that a fact is genuinely disputed, the non-moving party must cite to the record to demonstrate that the moving party has not established the absence of a genuine dispute.  USCIT R. 56(c)(1)(A)–(B).  Rule 56 further provides that

> [i]f a party fails to support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it.

USCIT R. 56(e)(3).  Therefore, the opposing party may not fulfill its obligations under the Rule by merely asserting that a genuine issue exists for trial.  See id.

Here, Defendant does not offer any evidence to support his bare assertion that the imported products are "insulated food or beverage bags" within the meaning of 4202.92.1000, HTSUS.  Defendant alleges that the "cooling liquid" sandwiched in the sidewalls acts as an insulator because it is "used to maintain a cool temperature of beverages."[18]  See Def.'s Resp. and XMSJ Br. 3, 9.  However, the ability to insulate within the meaning of the tariff provision requires that insulated products can maintain temperature regardless of whether the food or beverage is hot or cold.  Nowhere does Defendant assert that any of the materials that compose the imported merchandise have the ability to maintain the temperature of a hot food or beverage within the meaning of subheading 4202.92.1000.  Moreover, Defendant offers no factual evidence that supports the notion that either the polyvinyl chloride ("PVC"), from which the sidewalls of the

---

[18] Defendant argues that the bags are designed to keep beverages chilled, which gives them insulating properties.  Def.'s Suppl. Br. 4.  However, as already discussed, the term "insulated food or beverage bag" refers to slowing or preventing the passage of heat to or from the food or beverage to maintain its temperature, not to the conduction of heat to a mass that can absorb heat after being chilled.

imported merchandise is composed, or the water, ethylene glycol, or coloring, which is contained in the cells in the sidewalls, have any ability to maintain the temperature of a hot food or beverage for any length of time.  Therefore, Defendant has failed to raise a genuine issue of fact as to the ability of the imported merchandise to insulate within the meaning of the tariff term.  Defendant's statement that the subject merchandise are "insulated food or beverage bags" within the meaning of 4202.92.1000, HTSUS, is materially false as a matter of law.[19]

Defendant argues that he has provided evidence that the thermal conductivity of water, which is the primary component of the liquid sandwiched in the sidewalls of all the imported merchandise, acts as an insulator.  Reply Supp. Def.'s Cross-Mot. Summ. J. 2– 3, Nov. 18, 2016, ECF No., 23 ("Def.'s Cross-Mot. Reply").  To support this argument, Defendant relies upon a chart provided to Defendant by his counsel at his deposition that shows that the thermal conductivity of water is 0.60 watts per meter-kelvin ("W/(m. K)"), which Defendant argues reflects low thermal conductivity.  See id. (citing "Thermal Conductivity",              Wikipedia              (Nov.              18,              2016), https://en.wikipedia.org/wiki/Thermal_conductivity).  Defendant also cites the same chart for the notion that water has a thermal conductivity similar to that of rubber, which Defendant states has a thermal conductivity of 0.16 W/m. K.  Id. at 3 (citing "Thermal

---

[19] To the extent that Defendant implies that the "insulating liquid," on which Defendant claims the merchandise relies to maintain the temperature of beverages placed within the bags, see Def.'s R. 56.3 Resp. ¶ 6, "could include small bubbles therein to form a foam," id. at ¶ 7, Defendant offers no evidence that any bubbles formed in the liquid would have insulating properties. Therefore, this statement likewise fails to raise an issue of fact as to whether any of the imported merchandise is an "insulated food or beverage bag" within the meaning of subheading 4202.92.1000, HTSUS.

Conductivity",        Wikipedia        (Nov.        18,        2016),
https://en.wikipedia.org/wiki/Thermal_conductivity).   However, merely citing a source

stating the thermal conductivity of water is insufficient to raise a triable issue of fact as to

whether the imported merchandise is a "insulated food or beverage bag" because

Defendant offers no evidence indicating that a substance with a thermal conductivity of

0.60 W/(m. K) can maintain the temperature of a hot food for any length of time.[20]

### C. Penalties on Negligently Entered Imported Merchandise

Plaintiff argues that Defendant negligently made material and false statements by

misclassifying the imported merchandise under subheading 4202.92.1000, HTSUS, as a

matter of a law.  Gov't's SJ Br. 9–10.  Defendant's defense that he properly classified the

merchandise under subheading 4202.92.1000, HTSUS, see Def.'s Resp. and XMSJ Br.

6–14, fails as a matter of law because he failed to raise an issue of fact as to whether the

merchandise can maintain the temperature of a hot food or beverage.   Defendant further

responds that no penalty is warranted because Defendant exercised reasonable care in

classifying his products as entered.  Id. at 15–18.  For the reasons that follow, Plaintiff is

entitled to a penalty on the unpaid duties because Defendant failed to exercise

reasonable care as a matter of law.

A person is prohibited, without regard to whether the United States is deprived of

all or a portion of any lawful duty, from negligently entering any merchandise into the

---

[20] Because the imported merchandise is not an "insulated food or beverage bag" within the meaning of 4202.92.1000, HTSUS, the court need not address whether Defendant's implicit characterization of the imported merchandise as "food or beverage bags" is false to resolve the parties' claims.

commerce of the United States by means of a materially false document or electronically

transmitted data or information or oral statement.  19 U.S.C. § 1592(a)(1)(A).  Moreover,

the statute makes a negligent violation of § 1592 punishable by a civil penalty.  See 19

U.S.C. § 1592(c)(3).  In proceedings before the Court for the recovery of a monetary

penalty under the statute, "if the monetary penalty is based on negligence, the United

States shall have the burden of proof to establish the act or omission constituting the

violation."  19 U.S.C. § 1592(e).  However, "the alleged violator shall have the burden of

proof that the act or omission did not occur as a result of negligence."  Id.  Negligence is

not defined separately in the statute.  CBP's regulations define a negligent violation for

purposes of § 1592 as one that:

> results from an act or acts (of commission or omission) done through either
> the failure to exercise the degree of reasonable care and competence
> expected from a person in the same circumstances either: (a) in
> ascertaining the facts or in drawing inferences therefrom, in ascertaining the
> offender's obligations under the statute; or (b) in communicating information
> in a manner so that it may be understood by the recipient.  As a general
> rule, a violation is negligent if it results from failure to exercise reasonable
> care and competence: (a) to ensure that statements made and information
> provided in connection with the importation of merchandise are complete
> and accurate; or (b) to perform any material act required by statute or
> regulation.

19 C.F.R. Pt. 171, App'x B (C)(1).

Here, Defendant failed to exercise reasonable care because he failed to undertake

the steps a reasonable importer would have taken to verify that the classification listed on

the entry documents was correct.  With respect to the entries of Wine Bottle Wraps and

CoolCan imported merchandise, Defendant fails to allege that he provided marketing

photographs, instructions, or other documentation with respect to the Wine Bottle Wraps

and CoolCan merchandise to Priority One.  See Broker Correspondence at Priority One

0001–0010 (including only documentation with respect to the CoolSack merchandise in communications between Defendant and Priority One).  As a matter of law, Defendant cannot have reasonably relied upon Priority One's advice to classify the Wine Bottle Wrap or CoolCan merchandise while only providing it with documentation concerning the CoolSack merchandise.[21]

With respect to the CoolSack, prior to importation, Priority One initially suggested the CoolSack merchandise should be classified in a category carrying a 17.6% duty, then changed its recommendation to classify the CoolSack as an "insulated food or beverage bag of man-made fibers" carrying a duty rate of 7% ad valorem, and finally changed the classification to another subheading with a lower rate.[22]  See Def.'s R. 56.3 Resp. ¶ 24;

---

[21] Plaintiff also points out that there is a discrepancy between what content Defendant advised his customs broker filled the cells of the imported merchandise and the actual liquid filling according to Defendant's Rule 56.3 statement.  See Pl.'s Opp'n Def.'s Cross-Mot. Summ. J. and Reply Supp. Pl.'s Mot. Summ J. 8, Nov. 3 2016, ECF No 22 (citing Broker Correspondence at Priority One 0001 (stating that the contents of the cells was "purified water, ethylene glycol and color powder"); Def. Artistic Creations Rule 56.3 Statement Material Facts ¶ 5, Sept. 29, 2016, ECF No. 18 (stating that the liquid-filled cells contain "propylene glycol, purified water, and color powder" not ethylene glycol, purified water, and color powder).  Defendant does appear to concede there is a discrepancy between what was provided to his customs broker and the actual contents, calling the issue "nothing more than a red herring."  Def.'s Cross-Mot. Reply 1.  However, the court cannot attach any significance to this discrepancy for purposes of this motion because there is no evidence on the record to suggest this fact is material.

[22] There is uncontroverted evidence on the record that, prior to importation, Priority One recommended three different proposed customs classifications between 1:57 PM and 2:16 PM on February 16, 2010.  See Broker Correspondence at Priority One 0014–0023.  On February 25, 2010, at 1:57 PM, a representative of Priority One sent an e-mail recommending "17.6% duty" in response to Defendant's inquiry asking the broker to "please check to see if there will be any duty on [the CoolSack] merchandise."  Broker Correspondence at Priority One 0014.  On February 25, 2010, at 2:02 PM, the same representative of Priority One tried to recall the first e-mail message.  See id. at Priority One 0017.  Nothing in the record indicates that the customs broker successfully recalled the message.  In any event, on February 25, 2010, at 2:03 PM, the same

(footnote continued)

Broker Correspondence at Priority One 0014–0023.   Under these circumstances, a

reasonable importer would have taken some further steps to investigate the proper

classification given the uncertainty created by the broker's disparate recommendations in

such a short time.   Yet, Defendant admits that he never questioned or further discussed

Priority One's recommendation prior to importation despite uncontroverted evidence that

the broker offered three separate recommendations in a span of less than 20 minutes.

Def.'s R. 56.3 Resp. ¶ 25; Pl.'s R. 56.3 Statement ¶ 25.   Nor did Defendant seek a binding

ruling for the subject merchandise or consult the publicly available CROSS database of

customs rulings prior to importation.[23]   Pl.'s R. 56.3 Statement ¶ 20–21; Def.'s R. 56.3

Resp. ¶ 20–21.   Further, Defendant did not allege that he participated in a CBP pre-

classification of the imported merchandise or that he consulted the tariff schedules,

informed compliance publications, court cases, and/or CBP rulings, a lawyer, accountant,

or customs consultant.   Defendant did not seek a binding ruling for the subject

merchandise prior to further importation of merchandise.   Pl.'s R. 56.3 Statement ¶ 20;

---

representative of Priority One sent a second e-mail stating, "o.k. insulated food or beverage bag of man-made fibers [. . . ] 7%." Id. at Priority One 0018.  At 2:16 PM on February 25, 2010, the same Priority One representative sent a third e-mail stating:

> I promise this is the last on this subject. :)

> I talked to my boss James and he and I concur that the insulated wine bags made of PVC should go under "other" bringing the duty rate to 3.4%.  [T]his is the best fit for the bags.

Id. at Priority One 0021.

Although Defendant does not admit that his customs broker made three recommendations, Defendant offers no evidence to refute the account offered in his own exhibits, which contains three separate recommendations.

[23] Defendant concedes that he did not consult any such rulings prior to the time of importation. See Pl.'s R. 56.3 Statement ¶ 21; Def.'s R. 56.3 Resp. ¶ 21.  Therefore, Defendant cannot have relied, reasonably or otherwise, upon CBP rulings that he did not consult until after importation.

Def.'s R. 56.3 Resp. ¶ 20.  Given the three conflicting classifications recommended by the broker, Defendant had a duty to undertake some further investigation regarding the proper classification, whether it meant consulting the CROSS database of customs rulings, obtaining a second opinion, or consulting a customs attorney or other customs expert.   There were also publicly-available customs rulings that, had Defendant consulted, would have alerted him to a potential problem with his classification prompting further investigation.   Defendant could not reasonably have relied upon the recommendation of its customs broker under these circumstances.   Without even questioning the broker's changing advice, seeking any form of guidance from CBP, consulting publicly available rulings that may have raised questions about the classification, Defendant cannot have exercised reasonable care in classifying the entries prior to importation.[24]

Defendant argues that he exercised reasonable care because he relied upon Priority One's recommended classification for the CoolSack Merchandise.  See Def.'s Resp. and XMSJ Br. 17–18.   Defendant further alleges that Priority One reviewed customs Ruling HQ W968427, which he argues is the most instructive ruling.  Id. at 17.

---

[24] Once CBP sent proposed notices of action, the first of which was sent on April 16, 2012, Pl.'s R. 56.3 Statement ¶¶ 30–31; Def.'s R. 56.3 Resp. ¶¶ 30–31, Defendant had a heightened duty to investigate the propriety of the classification on entries of merchandise imported thereafter.  Yet, the only step allegedly taken by Plaintiff was to ask his customs broker for additional guidance. Even then, Defendant does not allege that he sought any advice from a lawyer, a second opinion from another customs broker, or the advice of any other third party to further investigate the classification of the imported merchandise.   Rather, Defendant continued to import the same merchandise under the same classification with only guidance from the same customs broker. Because Defendant did not exercise reasonable care prior to importation, the alleged further consultation with Priority One was insufficient as a matter of law to meet his heightened burden after CBP called his classification into question.

First, as already discussed, Defendant cannot have exercised reasonable care by relying upon the advice of only its customs broker where that customs broker had made three conflicting classification recommendations and Defendant does not allege that he undertook any efforts to further investigate those recommendations.  Second, neither Defendant, nor his customs broker, may reasonably rely upon one customs ruling where there are conflicting publicly available customs rulings.[25]  In such circumstances, a reasonable importer would have undertaken some further steps, whether obtaining a pre-importation ruling, consulting the CROSS database himself, obtaining further advice from an attorney or another customs professional, or some other steps, to verify the accuracy of the recommended classification.  Defendant admits that he took no such steps.

---

[25] Moreover, the letter written by Priority One in response to CBP's Notices of Action references Ruling HQ W968427, dated October 19, 2006.  See Priority One Letter at CBP000286, Sept. 29, 2016, ECF No. 20-5 (citing Ruling HQ W968427)).  The merchandise at issue in Ruling HQ W968427 is described as a "wine bottle bag . . . composed of 4 [millimeters] of Neoprene rubber sandwiched between two layers of knit man-made fabric. . . . The hangtag information submitted with [the] request states that the wine bottle bag is 'clink proof, made with wetsuit grade neoprene, insulates for hours and lays flat when not in use.  Marketing literature also submitted with [the] request emphasizes that the wine bottle bag insulates hot or cold beverages for up to four hours, is clink proof and allows for easy transport."  Ruling HQ W968427.  The physical differences between the imported merchandise, which is not made of neoprene rubber viewed together with the fact that the tag for Defendant's imported merchandise does not suggest the imported merchandise insulates hot or cold beverages for up to four hours both emphasize that a reasonable importer would have undertaken further investigation as to the applicability of the customs ruling.  In addition, other publicly available customs rulings were available finding that other classifications were proper for bottle bags constructed of plastic sheeting and filled with liquids.   See e.g., NY N037124 (Oct. 2, 2008), available at 2008 WL 4647577 (finding that subheading 4202.92.90, HTSUS, was the proper classification for a bottle bag constructed with an outer surface of PVC with pockets containing a liquid gel substance and a top opening with no means of closure); NY N066398 (July 24, 2009), available at 2009 WL 2423576 (finding that subheading 4202.92.90 was the proper classification for an open-top wine bottle bag coated on the outer surface with a sheeting of plastic).  Given these circumstances, Defendant did not act with reasonable care by failing to undertake any further investigation and advice concerning the proper classification from some source other than Priority One.

### D. Issues of Fact Remain as to Whether the Amount of the Penalty is Appropriate

Plaintiff argues that it is entitled to one-fourth of the maximum penalty permitted for negligence.   Gov't's SJ Br. 10–13.   Defendant does not respond to Plaintiff's arguments concerning the appropriateness of the size of the penalty requested, but rather opposes the imposition of any penalty on the grounds that Defendant exercised reasonable care.   Def.'s Resp. and XMSJ Br. 18.   The court has already found that a penalty is warranted for Defendant's negligently made materially false entry documents. Nonetheless, for the reasons that follow, the court denies Plaintiff's motion for summary judgment as to the appropriateness of the penalty.

The statute sets maximum penalties for a negligent violation of 19 U.S.C. § 1592(a) at: "the lesser of – (i) the domestic value of the merchandise, or (ii) two times the lawful duties, taxes, and fees of which the United States is or may be deprived."   19 U.S.C. § 1592(c)(3)(A)(i)–(ii).   A trial court has considerable discretion to award civil penalties within the statutory range.   United States v. Ford Motor Co., 463 F.3d 1267, 1285 (Fed. Cir. 2006).   The court views as persuasive the fourteen non-exclusive factors to serve as a guide in exercising its discretion to assess the appropriateness of civil penalties.   See United States v. Complex Mach. Works Co., 23 CIT 942, 949, 83 F. Supp. 2d 1307, 1314 (1999); see also Ford, 463 F.3d at 1285 (reviewing the court's application of the fourteen factor test applied in Complex Mach. Works, and concluding that the trial court's decision to impose the maximum penalty based on that standard was within its discretion).   Those factors include:

1.  the defendant's good faith effort to comply with the statute,
2.  the defendant's degree of culpability,

3.  the defendant's history of previous violations,
4.  the nature of the public interest in ensuring compliance with the regulations involved,
5.  the nature and circumstances of the violation at issue,
6.  the gravity of the violation,
7.  the defendant's ability to pay,
8.  the appropriateness of the size of the penalty to the defendant's business and the effect of a penalty on the defendant's ability to continue doing business,
9.  that the penalty not otherwise be shocking to the conscience of the Court,
10. the economic benefit gained by the defendant through the violation,
11. the degree of harm to the public,
12. the value of vindicating the agency authority,
13. whether the party sought to be protected by the statute had been adequately compensated for the harm, and
14. such other matters as justice may require.

Complex Mach. Works, 23 CIT at 949–50, 82 F. Supp. 2d at 1315.

The court may apply the Complex Mach. Works factors on summary judgment where there are sufficient undisputed facts to permit the court to assess the appropriateness of the penalty.  However, neither Plaintiff nor Defendant point to facts in the record supporting Defendant's history of previous violations, Defendant's ability to pay, and the appropriateness of the size of the penalty to Defendant's business and the effect of a penalty on the Defendant's ability to continue doing business.  Without a developed record of undisputed facts bearing on these material factors, the court declines to find as a matter of law that the penalty demanded by Plaintiff is appropriate.  The court denies summary judgment to provide the parties an opportunity to develop a more adequate record addressing these important factors.

## II.  Plaintiff is Entitled to Summary Judgment on its Claims for Unpaid Duties and Prejudgment Interest

Plaintiff moves for summary judgment on its claims for unpaid duties on Defendant's entries of imported merchandise and prejudgment interest.  Gov't SJ Br. 13–14.  The court first discusses Plaintiff's claim for summary judgment on its claims for unpaid duties.  Next, the court addresses Plaintiff's claim for prejudgment interest.

### A.  Unpaid Duties

Plaintiff argues that CBP is entitled to the unpaid duties assessed in the amount of $8,228.10 because Defendant failed to exhaust administrative remedies with respect to a challenge to the correct classification of the imported merchandise.  Gov't SJ Br. 13–14.  Defendant responds that, because Plaintiff properly classified the merchandise, he should not be liable for unpaid duties or prejudgment interest.  Def.'s Resp. and XMSJ Br. 18.  For the reasons that follow the court grants Plaintiff's motion for summary judgment on its claim that it is entitled to unpaid duties in the amount of $8,228.20 and prejudgment interest.

CBP's decisions as to the correct classification of merchandise and the rate and amount of duties chargeable are final and conclusive upon all persons unless: (1) a protest is filed; or (2) a civil action contesting the denial of a protest, in whole or in part, is commenced in the Court of International Trade.  19 U.S.C. § 1514(a).  The statute provides explicit rules for filing a protest.  A protest of a classification decision must be filed in writing, or transmitted electronically pursuant to an electronic data interchange system in accordance with Commerce's regulations within 180 days after but not before the date of liquidation or reliquidation.  19 U.S.C. §§ 1514(c)(1), (c)(3)(A).

CBP's classification decision is correct and conclusive because Defendant failed to file a timely protest and failed to commence a timely civil action contesting the denial of a protest, as required under § 1514.[26]  See 19 U.S.C. § 1514(a).  Therefore, Plaintiff is entitled to summary judgment on its claim that it is entitled to unpaid duties as a matter of law.  Further, Defendant has attached to its motion an accounting of the unpaid duties as of November 18, 2014, which states that a total amount of actual and potential revenue loss due to Defendant's misclassification of the entries is $90,748.42 (potential loss of revenue of $79,724.11 + actual loss of revenue of $11,024.31)[.]"  Penalty Notice.  Further, the Penalty Notice states that the surety paid the full potential loss of revenue of $79,724.11 and a partial payment of $2,796.11 towards the actual revenue loss (i.e., total payments from the surety of $82,520.22).  See id.  According to the penalty notice, only actual loss of revenue remains outstanding, and the letter states that remaining actual loss of revenue is $8,228.20 as of November 18, 2014.  See id.  Defendant does not contest the accounting of the revenue loss attached to Plaintiff's motion.  Nor does Defendant allege that any additional payments were made by any party thereafter.  As already discussed, Defendant's defense that no unpaid duties are owed because the entries were properly classified, see Def.'s Resp. and XMSJ Br. 6–14, is without merit.  Therefore, Plaintiff is entitled to summary judgment on its claim for unpaid duties in the amount of $8,228.20.

---

[26] The court need not find that CBP's classification is correct as a matter of law because CBP's classification decision is final and correct in the absence of a protest by Defendant.  See 19 U.S.C. § 1514(a).

Defendant claims that Plaintiff is not entitled to summary judgment on its claim for duties because Defendant protested CBP's classification via a letter signed by his customs broker, dated April 23, 2012, which Priority One sent to an official at CBP.  See Def.'s R. 56.3 Resp. ¶ 42 (citing Priority One Letter at CBP000286).[27]  As an initial matter, Defendant does not raise an argument that the letter from Priority One is a protest in its response to Plaintiff's motion for summary judgment or in support of his cross motion. Further, the letter clearly states that it is a response to CBP's proposed notice of action because it references CBP's Form CF-29 Proposed Notice of Action and does not state it is protesting the entries listed or any other entries.   See Priority One Letter at CBP000286.  There is nothing in the letter to indicate an intention to preserve a challenge to the other subject entries not referenced.

Moreover, even if the letter could be construed as an attempt to protest, it would fail because it does not comply with the strict requirements for filing a protest.  The statute requires that a protest set forth distinctly and specifically: (1) each decision to which the protest is made; (2) each category of merchandise affected by each decision; (3) the nature of each objection and the reasons therefore; and (4) any other matter required by CBP's regulations.  19 U.S.C. § 1514(c)(1)(A)–(D).  CBP's regulations require that a written protest against a decision of CBP be "filed in quadruplicate on CBP Form 19 or a form of the same size clearly labeled 'Protest' and setting forth the same content [as Form 19] in its entirety, in the same order, addressed to CBP."  19 C.F.R. § 174.12(b).  In the

---

[27] The letter references entries E10-0207688-6, E10-0205845-4, E10-0206426-2, E10-0206679-6 and E10-0208229-8.  See Priority One Letter at CBP000286.

alternative, the protest may be transmitted electronically pursuant to an electronic data

system authorized by CBP for that purpose.  Id.  A protest must also contain the following

relevant information: (1) the name and address of the protestant; (2) the importer number

of the protestant; (3) the number and date of the entry; (4) the date of liquidation of the

entry, or the date of a decision not involving a liquidation or reliquidation; (5) a specific

description of the merchandise affected by the decision as to which the protest is made;

(6) the nature of, and justification for the objection set forth distinctly and specifically with

respect to each category, payment, claim, decision, or refusal; (7) the date of receipt and

protest number of any protest previously filed that is the subject of a pending application

for further review and that is alleged to involve the same merchandise and the same

issues; (8) if another party has not filed a timely protest, a protest by a surety shall certify

that the protest is not being filed collusively to extend another person's time to protest;

and (9) a declaration, to the best of the protestant's knowledge, as to whether the entry

is subject to drawback or whether the entry has been referenced on other documentation

to enable a party to make such entry the subject of drawback.  19 C.F.R. § 174.13(a).

        Defendant does not allege that the letter was filed in quadruplicate or that the letter

was filed with CBP electronically pursuant to an authorized electronic data system.  The

letter is neither labeled "protest" nor uses that term at all.  See Priority One Letter at

CBP000286 (although it would not be dispositive, even Defendant's own label for Exhibit

K in support of his cross-motion labels the letter "correspondence," not a "protest").  The

letter does not set forth distinctly and specifically each decision to which protest is made.

The Priority One letter does list the number together with the date of each entry, the date

of the decision purportedly protested, or a declaration as to whether the entry is the subject of drawback or whether the entry has been referenced on proper documentation so as to enable a party to make such entry the subject of drawback.

Importantly, the letter identifies entries E10-0205845-4, E10-0206426-2, E10-0206679-6, E10-0207688-6, and E10-0208229-8.   Priority One Letter at CBP000286. The Notices of Action referencing those entries, which are all dated after the date of Priority One's letter, state that these entries had not liquidated as of the date of Priority One's letter.  See Pl.'s Mot. Summ. J. Ex. 20, Aug. 25, 2016, ECF Nos. 14-8 (containing Notices of Action, dated May 5, 2012 and May 9, 2012 rate advancing entries E10-0206426-2, E10-0206679-6, and E10-0207688-6 and indicating these entries were still in the liquidation process as of the date of each Notice of Action); Pl.'s Mot. Summ. J. Exs. 23, Aug. 25, 2016, ECF Nos. 14-9 (containing Notices of Action, dated June 9, 2012, rate advancing entries E10-0205845-4 and E10-0208229-8 and indicating these entries were still in the liquidation process as of June 9, 2012).  A protest must be filed with CBP "within 180 days after but not before date of liquidation or reliquidation."   19 U.S.C. § 1514(c)(3)(B).  The letter referenced by Defendant as a purported protest was sent prior to liquidation of the entries identified in the letter.  Therefore, even if the letter were a protest, it would not be timely filed under 19 U.S.C. § 1514(c)(3)(B).

### B.  Prejudgment Interest

Plaintiff also seeks an award for prejudgment interest on the unpaid duties because the Government did not delay in bringing or prosecuting the action and Defendant refused to pay outstanding duties despite CBP's numerous requests.  Gov't's

SJ Br. 14.  Defendant does not respond to this argument.  The court grants Plaintiff's

motion for summary judgment on its claim for prejudgment interest.

Although the statute does not explicitly authorize an award of prejudgment interest,

courts have discretion to award prejudgment interest on unpaid duties as a matter of

equity and fairness to compensate the government for the loss of use of the money due.

United States v. Imperial Food Imports, 834 F.2d 1013, 1016 (Fed. Cir. 1987).  Factors

considered in awarding prejudgment interest include "(1) the degree of personal

wrongdoing on the part of the defendant, (2) the availability of alternative investment

opportunities for plaintiff, (3) whether the plaintiff delayed in bringing or prosecuting the

action, and (4) other fundamental considerations of fairness."  United States v. Great Am.

Ins. Co. of N.Y., 783 F.3d 1320, 1326 (Fed. Cir. 2013).  In considering whether to award

prejudgment interest, Courts have particularly noted it appropriate to consider the extent

to which non-payment of estimated duties by a defendant should fairly be awarded to the

government to compensate it for the loss of use of the money due.  See, e.g., Imperial

Food Imports, 834 F.2d at 1016.

Here, the court grants Plaintiff's request for prejudgment interest because there is

no reason why the government should have been deprived of the duties to which it was

owed after CBP sent its final demand for payment.  Defendant did not even file a protest

let alone file a challenge to the denial of a protest concerning the classification.  It is fair

and equitable to compensate the government for the loss of use of the money due

particularly where Defendant took no steps to effectuate the necessary prerequisites to

challenge CBP's classification determination and there is no allegation that CBP has delayed in pursuing its claim for unpaid duties.

### III. Defendant's Cross Motion for Summary Judgment is Denied

Defendant seeks summary judgment "finding that the merchandise at issue was classified by Defendant in subheading 4202.92.1000, HTSUS, through the use of reasonable care, that the Defendant was not negligent in such classification, and that no penalty should be assessed; and . . . dismissing this action in its entirety." Def.'s Cross-Mot. Summ. J., Sept. 29, 2016, ECF No. 17. Defendant further suggests that

> [i]f the Court finds that the principal use of [Defendants'] products is as insulated beverage bags to maintain the temperature of beverages, then, as a matter of law, the subject merchandise should be classified in subheading 4202.92.1000[, HTSUS] as originally classified by [Defendant]. [Defendant] should, to the extent that the law allows or as justice requires, therefore, be refunded the difference between the 17.6 percent and 3.4 percent duty rates overpaid by [Defendant] for the transactions at issue and, [Defendant] respectfully requests the Court to enter summary judgment accordingly as to both the duties and a penalty.[28]

See Def.'s Resp. and XMSJ Br. 18. Plaintiff responds that Defendant's cross motion challenging CBP's classification decision is barred because Defendant neither filed a protest nor commenced a civil action contesting the denial of a protest. Pl.'s Resp. Cross-Mot. and Reply Br. 2–7.

As already discussed, CBP's decisions as to the correct classification of merchandise are final and conclusive upon all persons unless: (1) a protest is filed; or (2) a civil action contesting the denial of a protest, in whole or in part, is commenced in the

---

[28] Plaintiff did not file a counterclaim in this action seeking to challenge the denial of a protest by CBP under 19 U.S.C. § 1514. See Answer. Therefore, Defendant has no claim upon which the court can grant the relief he requests.

U.S. Court of International Trade.  19 U.S.C. § 1514(a).  As also discussed, a party can only commence an action contesting the denial of a protest if the person filed a protest pursuant to 19 U.S.C. § 1514, see 28 U.S.C. § 2631(a) (2012), and that party has paid all liquidated duties, charges, or exactions at the time the action is commenced.  See 28 U.S.C. § 2637(a).  Defendant took none of these steps.

Defendant cannot be entitled to summary judgment as to the correctnesss of his classification of the imported merchandise under subheading 4202.92.1000, HTSUS, because, as already discussed, the imported merchandise cannot be classified as entered.  Moreover, CBP's classification is final and conclusive, and Defendant's cross motion for summary judgment on any claims contesting the classification of his entries is foreclosed by the statutory scheme because he failed to file a timely protest.[29]  See 19 U.S.C. § 1514(a); 28 U.S.C. §§ 2631(a) (2012) (giving a person who filed a protest that is denied by CBP the right to bring a civil action contesting the denial of the protest), 2637(a) (providing that a civil action contesting the denial of a protest may only be commenced if all liquidated duties, charges, or exactions have been paid at the time the

---

[29] Defendant argues that 19 U.S.C. § 1592 requires the Court to review all issues de novo, including a classification decision that has not been protested in a penalty action.  Def.'s Cross-Mot. Reply 5–6 (citing 19 U.S.C. § 1592(e)(1) (stating that "[n]otwithstanding any other provision of law, in any proceeding commenced by the United States in the U.S. Court of International trade for the recovery of any monetary penalty . . . all issues, including the amount of the penalty, shall be tried de novo")).  However, the intended function of § 1592(e)'s de novo review provision is "not to throw open the litigation to any issue conceivably relevant to the determination of the penalty, but simply to 'emphasize[ ] lack of deference to Customs' final determination, including its findings of fact under § 1592(b).'"  Ford, 463 F.3d at 1298 (citations omitted).  The statute does not "permit an importer to end-run the protest provisions of § 1514 and litigate, in a penalty proceeding, issues unrelated to the investigation that identified the violation and that would otherwise have been long been foreclosed."  Id.

action is commenced with the exception of certain obligations of a surety).  Accordingly,

Defendant's cross motion is denied.

## CONCLUSION

Based on the foregoing, Defendant is entitled to summary judgment on its claim

for unpaid duties in the amount of $8,228.20, plus interest from the date of judgment until

it is paid.  In addition, Plaintiff is entitled to summary judgment on its claim that Defendant

entered merchandise into the commerce of the United States by means of material and

false statements for the imported merchandise.   Further, Defendant's material false

statements justify the imposition of a statutory penalty.   However, the court denies

summary judgment on the $45,374.21 statutory penalty amount requested by Plaintiff.[30]

Because the resolution of Defendant's unpaid duty claim does not implicate the resolution

of the outstanding civil penalty issues, see 19 U.S.C. § 1592(a) (loss of revenue from

unpaid duties is not an element of a cause of action for civil penalties under § 1592), the

court deems it appropriate to enter judgment on the unpaid duties pursuant to USCIT

Rule 54(b).  See USCIT R. 54(b) (providing that the court "may direct entry of a final

judgment as to one or more, but fewer than all, claims or parties only if the court expressly

determines that there is no just reason for delay).   As already discussed, CBP's

assessment of duties owed is final and conclusive since Defendant has not filed a protest

or filed any action challenging the denial of such protest.  See 19 U.S.C. § 1514(a); 28

U.S.C. §§ 2631(a), 2637(a) (2012).  Accordingly, the circumstances favor the immediate

---

[30] The penalty requested by Defendant is equal to one-half of the amount of the total revenue loss identified by CBP in the pre-penalty and penalty notices.  See Exs. Provided Supp. Pl.'s Mot. Summ. J. at Exs. 27–28, Aug. 25, 2016, ECF No. 14-9.

entry of partial judgment for Defendant as to the unpaid duties and the award of equitable

prejudgment interest.  Based on the foregoing, partial judgment will enter accordingly

pursuant to USCIT Rule 54(b).

Therefore, upon consideration of Plaintiff's motion for summary judgment,

Defendant's cross-motion for summary judgment, upon all other pertinent papers filed

with the court, and upon due deliberation, it is

**ORDERED** that the parties shall confer and file a joint status report on or before

August 9, 2017, advising the court: (i) what evidence each party intends to submit so that

the court may to evaluate the appropriateness of the penalty requested by Defendant

based upon the factors enumerated in United States v. Complex Mach. Works Co., 23

CIT 942, 83 F. Supp. 2d 1307 (1999); (ii) whether further discovery is necessary to permit

the court to evaluate the appropriateness of the penalty requested by Defendant; and (iii)

whether the parties believe factual issues exist that would prevent the court from

evaluating those factors without a trial.


  /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated: July 13, 2017
       New York, New York